UNITED STATES DISTRICT COURT     <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

DANIELLE KALP,

               Plaintiff,

\- versus -

KALMON DOLGIN AFFILIATES OF LONG
ISLAND INC., KND MANAGEMENT CO., INC.,
and NEIL A. DOLGIN, Individually,

               Defendants.

MEMORANDUM
<u>AND ORDER</u>
11-CV-4000 (JG)

A P P E A R A N C E S :

        PHILLIPS & ASSOCIATES, LLP
        30 Broad Street, 35th Floor
        New York, New York 10004
By:    Marjorie Mesidor
        *Attorneys for Plaintiff*


        KAUFMAN DOLOWICH VOLUCK & GONZO LLP
        135 Crossways Park Drive, Suite 201
        Woodbury, New York 11797
By:    Keith Gutstein
        Angel Sevilla
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

      Plaintiff Danielle Kalp brings this lawsuit alleging that Kalmon Dolgin Affiliates

of Long Island Inc., KND Management Co., Inc. ("KND")[1], and Neil A. Dolgin engaged in

pregnancy and gender discrimination, created a hostile work environment,[2] and also engaged in

unlawful retaliation, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e-2 ("Title VII"), as well as the New York City Human Rights Law ("NYCHRL"),

N.Y.C. Administrative Code § 8-101 *et seq*.

---

[1]     Kalmon Dolgin Affiliates is a real estate firm. KND Management is the management arm of
Kalmon Dolgin Affiliates. Both corporate entities are referred to collectively as "KND".

[2]     Although Kalp did not raise a hostile work environment claim in her complaint, she asserts one in
her opposition to the motion. Since, as described below, the claim has no merit, I need not address this procedural
irregularity.

Before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to Kalp unless otherwise noted.[3] Kalp began working as an administrative assistant for KND in October 2009. Defs.'s Rule 56.1 Stmt ¶ 8. KND is a real estate firm that manages, sells, and leases commercial properties. Defendant Neil Dolgin is the Co-President of KND. Joshua Dolgin, Neil's nephew, is the Senior Vice-President, and was Kalp's direct supervisor. Kalp's responsibilities included answering phone calls, tending to the front desk, data entry and other clerical tasks. *Id.* at ¶ 9.

A. *Kalp's relationship with her colleagues at KND*

During her employment at KND, Kalp developed an informal and friendly relationship with her colleagues. Defs.'s Rule 56.1 Stmt ¶ 10; *see also* Kalp Dep., 45:7-25; 50:9-15. She shared details regarding her personal life with her KND colleagues during and after work, including her personal relationships. *Id*.

Kalp had a similar informal relationship with Neil and Josh Dolgin. Kalp referred to Neil as "pops" (Kalp Dep. 95:21-23) and would "chitchat" with him regarding her personal life. Kalp Dep. 53:12-15; 55:17-56:3. In December 2010, Kalp asked Neil if KND would lend her money to pay the security deposit for an apartment she was renting with her boyfriend. Defs.'s Rule 56.1 Stmt ¶ 13. She explained that she was financially unable to make that payment on her own. *See* Kalp Dep. 63:15-21.

---

[3]     A number of statements in Kalp's Rule 56.1 Counter Statement of Facts are apparently misnumbered. I have matched her statements to the defendants' corresponding Rule 56.1 statements whenever possible.

*B. Kalp shares the news of her pregnancy with Neil Dolgin*

In January 2011 Kalp learned that she was pregnant. Defs.'s Rule 56.1 Stmt ¶16. At the time of her pregnancy, she was engaged to be married to Steve Stockin, who was the father of her baby. Kalp Dep. 74:23-75:8.

On February 3, 2011, approximately a week after she found out she was pregnant, Kalp informed Neil Dolgin. Defs.'s Rule 56.1 Stmt ¶ 37; Pl.'s Rule 56.1 Stmt ¶ 34. Specifically, after work hours Neil invited Kalp into his office and asked her what was wrong. Kalp Dep. 78:20-25. Kalp told him she was pregnant and began to cry. Kalp said that she was "overwhelmed." Defs.'s Rule 56.1 Stmt ¶¶ 39, 40; Kalp Dep. 80:9-18. Although the pregnancy was exciting news for Kalp, it was also scary because she was not expecting it. Kalp Dep. 80:9-18. Neil could tell that Kalp was nervous, Kalp Dep. 81:2-8, and a conversation regarding her pregnancy ensued.

The parties offer sharply conflicting accounts of this approximately twenty-minute conversation. Kalp Dep. 239:13-16. They agree that the financial responsibility of caring for a child was discussed. According to Kalp's version of the conversation, which I accept as true for purposes of this motion, Neil brought up the option of her having an abortion. Kalp Dep. 81:11-25. He asked if she was "planning to keep it," and told her that getting an abortion "was as easy as walking into a candy shop." *Id.* Kalp felt "incredibly uncomfortable" with these personal questions. Kalp Aff. ¶ 10.

In addition, Kalp alleges that she had a separate conversation with Neil the following day that lasted approximately three minutes. Kalp Dep. 239:21-24. During that conversation Neil asked her whether she had thought about their conversation the day before

regarding an abortion and stated that he would hate to see her "have a baby out of wedlock." Compl. ¶¶41-42.

### C. *Kalp's Relationship with Neil Dolgin after the February 3, 2011 conversation*

After Kalp informed Neil she was pregnant, she was not demoted and her work assignments did not change. Defs.'s Rule 56.1 Stmt ¶¶ 48-49. However, Kalp felt uncomfortable around Neil. Kalp Aff. ¶12. Accordingly, she tried to "lighten the tension" between them. Kalp Aff. ¶ 12.

On February 8, 2011, Kalp sent Neil an email informing him that she had a doctor's appointment on February 14, 2011 and would arrive to work late. Neil Dolgin Aff. Exh. B. Dolgin responded asking whether she "intentionally" made the appointment on Valentine's Day. Kalp responded: "Ummm no you dork. A probe up my vag[ina] isn't exactly my idea of romantic if that's what you're implying. But I totally respect whatever you and Cindy[4] are into. . ." *Id*. Kalp testified that she did not feel comfortable with Neil and she intended her statements to be a way of "lightening up the e-mail." Kalp Dep. 128:2-8. She testified that she "felt comfortable enough to write this e-mail" and that sometimes she would speak in inappropriate ways. Kalp Dep. 130:15-16; 128:17-20. Kalp was able to make her prenatal visit. Defs.'s Rule 56.1 Stmt ¶¶ 97-98.

### D. *Kalp complains of discrimination*

On Februaray 15, 2011, Kalp told Neil that she was feeling ill and would not be in the office that morning. Neil told her that he needed her in the office and for her to arrive by 11:30 a.m.

When Kalp arrived to work that day she spoke to Josh Dolgin and told him that she no longer wanted to discuss personal matters with Neil. Kalp Dep. 288:5-16. She asked

---

[4]    Cindy is Neil Dolgin's wife.

Josh to make Neil "stop all the harassment and disparate treatment." Compl. ¶50. Kalp claims that Josh agreed to speak to Neil and after this Neil "suddenly began to ignore" Kalp and refused to look at her. Compl. ¶¶ 50-51.

Kalp alleges that on February 22, 2011, she met with Josh Dolgin again and complained that since he had spoken to Neil, he was "retaliating against her by completely ignoring her and refusing to acknowledge her presence." Compl. ¶ 52.

### E. Kalp makes a request for an accommodation on February 22, 2011

On the same day that Kalp complained of retaliation by Neil, she requested that she be allowed to come into work two hours late every day. Kalp Dep. 143:15-20. She presented a note from her doctor stating that due to her epilepsy and pregnancy, she could not come into the office until 11:00 a.m. Compl. ¶ 53. KND granted her request. Kalp Dep. 143:18-20.

### F. KND denies Kalp's request to take March 8, 2011 as a vacation day

On February 17, 2011, Kalp sent an email to Neil, Josh and Kalmon Dolgin[5], requesting March 7, 2011 as a vacation day. Defs.'s Rule 56.1 Stmt ¶ 68. On February 24, 2011, Kalp sent another email requesting permission to take March 8 as a vacation day as well. *Id.* at 69. KND granted Kalp's request to take March 7, 2011 as a vacation day, but denied her request for March 8, 2011.

KND has a policy which states in relevant part that "a minimum of two weeks [sic] notice is required prior to the taking of vacation." Defs.'s Rule 56.1 Stmt ¶ 66. Kalp asserts that this policy was in effect when she was hired but was not enforced with any regularity. Kalp Dep. 153:21-25.

### G. Kalp resigns

---

[5]    Kalmon Dolgin is the Co-President of KND.

On March 10, 2011, Vincent Contino, who managed KND's accounting division, asked Kalp not to engage in personal calls while working. Defs.'s Rule 56.1 Stmt ¶ 149. After this instruction, Kalp collected her belongings and quit. *Id.* at ¶ 150. On her way out of the office, she stated to Josh Dolgin, "I quit." *Id.* at ¶ 151.

## DISCUSSION

### A.    *The Legal Standard*

Under Federal Rule of Civil Procedure 56(c), summary judgment may not be granted unless all of the submissions taken together show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of a material factual question. In making this determination, a court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences against the moving party. *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Although the Second Circuit has emphasized the need for district courts to act with caution when considering whether to grant summary judgment to an employer in an employment discrimination case, a plaintiff must provide more than "conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal citations and quotations omitted). A defendant is entitled to summary judgment unless the plaintiff "can point to evidence that reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).

Kalp alleges pregnancy and gender discrimination, a hostile work environment, retaliation, and constructive termination.

### B.    *The Pregnancy and Gender Discrimination Claim*

Title VII prohibits "'discrimiat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of,' inter alia, 'such individual's . . . sex.'" *Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F.Supp.2d 146, 159 (E.D.N.Y. 2011) (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII was amended in 1978 by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which provides that discrimination "on the basis of sex include[s] . . . [discrimination] on the basis of pregnancy . . . [and] women affected by pregnancy . . . shall be treated the same for all employment-related purposes."[6]

In order to survive a motion for summary judgment on a claim of intentional discrimination, a Title VII plaintiff must satisfy a three-part burden-shifting test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) (applying *McDonnell Douglas* burden-shifting test to a pregnancy discrimination action). First, the plaintiff has the burden of establishing a *prima facie* case of discrimination. *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). A plaintiff must show that she (1) was a member of a protected class; (2) is competent to perform the job or is performing her duties satisfactorily; (3) suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). A plaintiff's burden in presenting a prima facie case is *de minimis*. *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

Second, where a plaintiff makes out a *prima facie* case, she "creates a presumption that the employer unlawfully discriminated, and thus places the burden of

---

[6]     Kalp couples her claims of gender and pregnancy discrimination and treats them for all purposes as co-extensive. *See e.g.*, Compl. ¶ 89; Pl. Mem. in Opp. at 7. I do the same.

production on the employer to proffer a nondiscriminatory reason for its action." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (citation omitted).

Finally, if the defendant puts forth a nondiscriminatory reason for its behavior, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). At this stage, all presumptions drop from the analysis and the question is whether a reasonable jury could find by a preponderance of the evidence that the defendant intentionally discriminated against the plaintiff on the basis of pregnancy or gender. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Burden shifting is not "intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Aikens*, 460 U.S. at 715 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

There is no dispute that Kalp was a member of a protected class and performed her duties at KND satisfactorily. The parties disagree regarding whether Kalp suffered an adverse employment action, and if so, whether this action occurred under circumstances giving rise to an inference of discrimination.

Kalp has identified what she contends were three adverse employment actions that she suffered as a result of pregnancy and gender discrimination: (1) although she was working a reduced work day due to her pregnancy, defendants expected her to produce at the same level as employees who were working full days; (2) her pay was reduced; and (3) she was denied a vacation day.

"Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Williams*, 368 F.3d at 128 (citation omitted). These examples demonstrate that to be "materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 128 (citation omitted).

Kalp concedes that after she informed Neil Dolgin of her pregnancy, her work assignments did not change, she was not demoted and continued to do tasks for Neil on a daily basis. Kalp Dep. 190:2-5; 265: 21-22; 56:4-17. She contends, however, that the defendants' expectation that she continue to produce at the same level after she began to work fewer hours was an adverse employment action. Pl.'s Rule 56.1 Stmt ¶ 43. Kalp testified as follows: "I was going in two hours late every day and working through most of my lunch and still expected to do the same amount of work that I did before I was going in those two hours late." Kalp Dep. 190:5-8. But Kalp does not provide any facts to support her claim that this "expectation" amounted to an adverse employment action. Nor does she cite examples of situations in which she was required to perform more tasks than her shortened work day would allow. In short, Kalp's conclusory statement is insufficient to establish that an adverse employment action occurred. Moreover, "'[a]n employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds . . .'" *Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 229 (E.D.N.Y. 1993) (citing *Palucki v. Sears Roebuck & Co.,* 879 F.2d 1568 (7th Cir. 1989)). In this case, there is no evidence to support an inference that Kalp's work assignments were excessive, let alone that they masked intentional discrimination.

To the extent that Kalp is relying on the defendants' criticism of her work productivity, these actions fail to establish adverse employment actions. "[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Honey v. County of Rockland,* 200 F.Supp.2d 311, 320 (S.D.N.Y. 2002). Thus, being advised and counseled does not, as a matter of law, constitute an adverse employment action. *See Weeks v. N.Y. State,* 273 F.3d 76, 86 (2d Cir. 2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.").

Kalp also alleges that her pay was reduced because of her pregnancy. She states in her complaint that she discovered on February 24, 2011 that "her paycheck that had been directly deposited into her checking account was subsequently withdrawn from the account." Compl. ¶ 57. In her opposition to the motion, Kalp alleges that her paycheck was reduced a full day "even though the only day [Kalp] missed was marked as a sick day, February 16, 2011." Kalp Mot. in Opp. p. 10. It is unclear whether Kalp's allegation in her complaint and the one in opposition to the motion refer to the same alleged pay reduction. Even so, Kalp fails to present any evidence that she took February 16, 2011 as a sick day; it is not supported in her affidavit or deposition testimony. Further, her "Employee Detail Earnings" does not show a reduction in Kalp's pay the week of February 16, 2011 or the following week[7]. Josh Dolgin Decl. Exh. A. Without evidence to support the claim that Kalp took February 16, 2011 as a sick day and her pay was reduced in connection with that day, a jury could not find that this was an adverse employment action.

---

[7] The earnings statement also shows that Kalp's pay was not reduced for her prenatal appointment on February 14, 2011, or when she arrived to work late on February 15, 2011.

Further, Kalp herself viewed the reduction in her pay as the result of her request for a two-hour delay in her starting time: "I believe [the reduced pay reflected the reduced hours] because what I was doing was I was coming in late, only taking a half hour lunch and staying until 5:30, so that would make sense that they would reduce my pay." Kalp Dep. 282:17-20. Though a reduction in pay can qualify in many circumstances as an actionable adverse employment action, here, where Kalp's pay was reduced due to her request to start work two hours later each day, it does not.

Finally, in February 2011 Kalp made two requests for vacation days – March 7, 2011 and March 8, 2011. She was allowed to take the first but not the second, resulting in a three-day weekend instead of a four-day one. She asserts that the denial of the second vacation day was an adverse employment action. I disagree. "The denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action." *Roff v. Low Surgical & Med. Supply, Inc.*, No. 03 Civ. 3655 (SJF), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004) (citing *Boyd v. Presbyterian Hosp. in the City of N.Y.,* 160 F.Supp.2d 522, 537–38 (S.D.N.Y. 2001)). Kalp has not demonstrated that the denial of her vacation request was a complete bar to her taking vacation. In fact, she took March 7, 2011 as a vacation day. The particular timing or length of a vacation is not so disruptive that it crosses the line from "mere inconvenience" to "materially adverse" employment action.

Kalp's factual allegations, individually and taken in totality, do not meet the burden of showing an adverse employment action necessary to establish a *prima facie* case of discrimination. *See, e.g., Fridia v. Henderson,* No. 99 Civ. 10749, 2000 WL 1772779, at *7

(S.D.N.Y. Nov. 30, 2000) (plaintiff's allegations of excessive work, denials of request for leave with pay, and supervisor's poor treatment of plaintiff, without more, insufficient).

Defendants' motion for summary judgment on this claim is therefore granted.[8]

*C.  The Hostile Work Environment Claim*

Kalp contends that the defendants created a hostile work environment during her pregnancy.  Title VII prohibits "a discriminatorily hostile or abusive [work] environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  To prevail on a claim that harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373 (citation omitted).

Unlike claims of discrimination based on disparate treatment or retaliation, a hostile work environment claim is "based on the cumulative effect of individual acts."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace.  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995).  Hostile work environment claims must meet both an objective and a subjective standard.  Not only must the victim herself "subjectively perceive [the] environment to be abusive," but the misconduct of which a plaintiff complains also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004) (citation omitted).

---

[8]     Accordingly, I need not address the defendants' additional claims that none of the challenged actions occurred in circumstances giving rise to an inference of discrimination and that Kalp has failed to demonstrate that the defendants' nondiscriminatory reasons for their actions were pretextual.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The evidence is judged by the totality of the circumstances. *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999).

Kalp has not presented sufficient evidence from which a jury could infer that the defendants created a hostile work environment during the approximately one-month period between her informing Neil Dolgin of her pregnancy and her resignation. The nub of Kalp's claim is that on three different occasions – February 3, 4 and 22, 2011 – Neil made inappropriate comments to her regarding her pregnancy. On the first of those dates, Kalp told Neil she was pregnant. She claims that during the 20-minute conversation that ensued, Neil asked if she wanted to keep the baby, whether she had considered abortion and if she made enough money to support a child. On February 4, 2011, Kalp had another conversation with Dolgin that lasted approximately three minutes. Kalp Dep. 239:19-24. During this conversation Neil asked whether she had thought more about an abortion and stated that he did not want her to have a child out of wedlock. Compl. ¶¶ 41-42[9]. Kalp alleges that on February 22, 2011 when she provided her doctor's note regarding her epilepsy and informed Neil that she was leaving early, he responded "what are breakthrough seizures anyway? I've never even heard of them," before walking away. Compl. ¶ 55.

Kalp has certainly alleged bad judgment by a supervisor and unprofessional conduct in the work place. The issue here, however, is whether Neil's conduct, if credited by a

---

[9]     Kalp did not include the facts relating to the February 4, 2011 conversation in her affidavit, but I will address the allegation based on her complaint.

jury, could constitute the creation of a hostile work environment that was severe or pervasive enough to alter the conditions of Kalp's employment. It does not. First, while the remarks by Neil were unwanted from Kalp's point of view, she does not even allege that Neil discussed her pregnancy in order to harass, intimidate, ridicule, or insult her in some way, or even that she perceived that to be his motive. Indeed, she testified that she was visibly upset during the February 3 meeting and believed that Neil was concerned about her when he spoke to her about the possibility of an abortion. Kalp Dep. 79:5-8. Further, Kalp testified that she was scared and overwhelmed by the pregnancy and began to cry when speaking to Neil about it. Kalp Dep. 80:9-18. While Neil's comments were inappropriate, they do not support an inference that he was motivated by a desire to harass Kalp.

This is especially clear when the conversations are considered within the larger context of their relationship. As stated above, Kalp testified that she would often "chitchat" with Neil and share personal information with him. Shortly before she became pregnant, she approached Neil about borrowing money from KND to rent an apartment. She testified that "everybody joked around" in the office, sometimes in "inappropriate ways." Kalp Dep. 128:17-19. Further, even after Neil's allegedly offensive comments, Kalp felt comfortable enough to email him regarding the details of her gynecological examination on February 8, 2011 and to make a joke in reference to Neil's sexual activity with his wife. Kalp Dep. 130:15-16. In sum, Kalp has not presented evidence from which a jury could find either an objective level of hostility that was "sufficiently severe or pervasive to alter the conditions" of her employment and create a hostile work environment or that Kalp subjectively perceived her work environment as hostile or abusive. Defendants' motion for summary judgment on this claim is therefore granted.

*D.  The Retaliation Claim*

Kalp also asserts a claim for retaliation based on her report of discrimination. Title VII retaliation claims are also governed by the *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79-81 (2d Cir. 2001). It is unlawful for an employer to retaliate by discriminating against an employee because the employee engaged in protected activity, that is, "has opposed any practice made an unlawful practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C § 2000e-3(a).

"To establish a prima facie case of retaliation, an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (quoting *Tomka,* 66 F.3d at 1308).

Here, Kalp's report to Josh Dolgin regarding Neil's conduct is, of course, protected activity. However, she has not shown any employment action that disadvantaged her or would induce a reasonable person to hesitate to make a complaint of discrimination. *See Tepperwien v. Entergy Nuclear Operations*, 663 F.3d 556, 568 (2d Cir. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59-60 (2006)). Under *Burlington Northern,* a materially adverse action in the retaliation context is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted). As the Supreme Court explained, both the language of Title VII's anti-retaliation provision and its protective purpose indicate that retaliation is not limited to discriminatory actions that affect the terms and conditions of employment. *See id.* at 62-64.

Thus, any action by an employer that would dissuade a reasonable employee from opposing discriminatory conduct can support a claim of retaliation. *See id.* at 67–68

Here, Kalp alleges that her pay was reduced when she took sick time on February 16, 2011 and she was expected to maintain her productivity despite her reduced hours in retaliation for her protected activity. As stated above, however, Kalp fails to support either of these allegations with evidence. Even accepting her allegations as true, these actions were "trivial harms" or "petty slights or minor annoyances" that would not dissuade a reasonable person in her situation from making a claim of discrimination. *See Burlington*, 548 U.S. at 68, *see also Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 721 (2d Cir. 2010) ("The anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm'") (citing *Burlington N.*, 548 U.S. at 67). These actions do not rise to the level of adverse employment.

Kalp further claims that after she made her report, Neil ceased all communications with her. Kalp Aff. ¶ 16. Kalp does not allege that this "isolation" made it difficult to continue her duties, and admits that her job assignments and responsibilities remained the same. Even viewing the facts in the light most favorable to Kalp, this does not make out an adverse action. *See Burlington*, 548 U.S. at 68 ("'[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable.'"). To the contrary, with her complaints she achieved her goal of discontinuing conversations with Neil regarding her personal life.

The defendants' motion for summary judgment on this claim is granted.[10]

*E. The Constructive Discharge Claim*

---

[10] To the extent Kalp is claiming that the defendants' retaliation took the form of her constructive discharge, the insufficiency of that allegation is addressed in the next section.

A constructive discharge is the most aggravated form of a hostile environment. *Ferraro v. Kellwood Co.,* 03 Civ. 8492 (SAS), 2004 WL 2646619 at *11 (S.D.N.Y. Nov. 18, 2004) (Scheindlin, D.J.), *aff'd,* 440 F.3d 96 (2d Cir. 2006) (explaining that "[c]onstructive discharge is regarded as an aggravated case of hostile work environment"). It "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Serricchio v. Wachovia Sec. LLC,* 658 F.3d 169, 185 (2d Cir. 2011). Given this high standard, an employee's mere dissatisfaction with job assignments or criticism from a supervisor do not, in themselves, give rise to a constructive discharge claim. *See, e.g.*, *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993); *Borrero v. Am. Express Bank,* 533 F.Supp.2d 429, 441 (S.D.N.Y.2008) (holding that an employee, who was told she would be terminated at the conclusion of her probationary period, stated sufficient facts to preclude summary judgment of her constructive discharge claim by presenting evidence that suggested a reasonable person in her position would have believed her termination was a "foregone conclusion"). At the same time, "the effect of a number of adverse conditions in the workplace is cumulative . . . [b]ecause a reasonable person encounters life's circumstances cumulatively and not individually." *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 90 (2d Cir.1996).

Kalp resigned from her position at KND on March 10, 2011 after Contino asked her to end her personal phone call. Kalp Dep. 269:2-6. After Contino's request, Kalp packed up her belongings and quit. Kalp Dep.270:6-24. Kalp alleges that Contino's request, along with Neil's statements regarding her pregnancy, caused her to resign. These allegations, even when examined collectively, do not constitute employment conditions that were so intolerable that a

reasonable person would have felt compelled to resign.  Accordingly, defendants' motion for summary judgment on this claim is granted.

### F.  Kalp's Claims of Discrimination and Retaliation under the NYCHRL

The NYCHRL, as amended by the Local Civil Rights Restoration Act of 2005, makes clear that it "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." *Id*. § 8–130.  Under the Restoration Act, "interpretations of State or federal provisions worded similarly to NYCHRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise.'" *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66–67 (1st Dep't 2009) (quoting § 1 of the Restoration Act).

To establish a prima facie case for pregnancy and gender discrimination and retaliation under the NYCHRL, Kalp need not show a materially adverse employment action, only that she was treated less well than other employees because of her membership in a protected class.  *Zambrano–Lamhaouhi*, 866 F.Supp.2d at 160.  This is also true to establish a claim for hostile work environment.  *Williams*, 61 A.D.3d at 78 (plaintiff need not demonstrate that the treatment was "severe or pervasive," she need only show that she has been "treated less well than other employees because of her gender."); *see also Zambrano–Lamhaouhi*, 866 F.Supp.2d at 161.

Though Kalp need not show a materially adverse employment action or that the hostility she suffered was severe or pervasive, she still fails to make a claim under the NYCHRL.

Kalp presents no evidence to support her allegations that she was treated less favorably than other individuals outside of the protected group, and her allegation is contradicted by the record. For example, Kalp alleges that when Rosemary Pawlukiewicz worked fewer hours, her pay was not docked.  Compl. ¶¶ 58, 65-66.  However, Kalp testified that she did not know whether Pawlukiewicz's pay was ever docked.  Kalp Dep. 285: 11-13.  Also, the record shows that Pawlukiewicz's pay was reduced when she worked fewer hours.  Neil Dolgin Decl., Exh. C, Pawlukiewicz's Earnings Statement.  Moreover, the record does not demonstrate discriminatory or retaliatory motive by the defendants.  *See Bateman v. Project Hospitality, Inc.*, No. 07–CV– 2085 (RRM), 2009 WL 3232856, at *4 (E.D.N.Y. Sept. 30, 2009) (discrimination claims, whether brought under Title VII, the SHRL, or the NYCHRL, require "facts sufficient to give rise to an inference of discriminatory motive").  Accordingly, these claims are dismissed.

### G.  Aiding and Abetting

The NYCHRL provides that "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce" the doing of acts prohibited by the NYCHRL. N.Y. Admin. Code § 8-107(6).  The conduct Kalp complains of was mostly engaged in by Neil Dolgin.  She does not allege what other discriminatory conduct occurred and by whom.

Kalp correctly alleges that individual liability may be imposed under the NYCHRL on an aiding and abetting theory even if the individual on whom the liability is imposed is the only person who acted wrongfully.  *See Maher v. Alliance Mortg. Banking Corp.,* 650 F.Supp.2d 249, 262 (E.D.N.Y. 2009) (holding "until the Second Circuit revisits this issue, an individual may be liable under § 296(6) for aiding and abetting an unlawful discriminatory practice of his employer even where his conduct serves as the sole predicate for the employer's liability"); *see also Tully–Boone v. North Shore–Long Island Jewish Hosp. Sys.,* 588 F.Supp.2d

419, 427 (E.D.N.Y. 2008). However, there can be no accessorial liability unless *someone* – an individual or the company (acting through an individual) – engaged in actionable conduct. For the reasons set forth above, I conclude that a reasonable jury could not conclude that Kalp was the victim of discrimination or retaliation. Thus, there can be no aiding and abetting liability.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted.

So ordered.


John Gleeson, U.S.D.J.

Dated: March 27, 2013
       Brooklyn, New York